ALOJZA JANUS, Plaintiff-Appellant, v. JAN TARASEWICZ, Adm'r of the Estate of Theresa Janus, Defendant-Appellee (Metropolitan Life Insurance Company, Defendant, Tadeusz Janus, Adm'r of the Estate of Stanley Janus, Defendant and Counterplaintiff-Appellant).

First District (1st Division)   No. 84—991

Opinion filed August 12, 1985.

Gabriel A. Kostecki, of Chicago, for appellant Tadeusz Janus.

Doyle & Ryan, Ltd., of Chicago (John A. Doyle, of counsel), for appellant Alojza Janus.

Carl F. Schroeder, of Carl F. Schroeder, Ltd., of Wheaton, and Donna A. Renn, of Renn & High, of Lisle (David A. Novoselsky, of counsel), for appellee.

JUSTICE O'CONNOR delivered the opinion of the court:

This nonjury declaratory judgment action arose out of the death of a husband and wife, Stanley and Theresa Janus, who died after ingesting Tylenol capsules which had been laced with cyanide by an unknown perpetrator prior to its sales in stores. Stanley Janus was pronounced dead shortly after he was admitted to the hospital. However, Theresa Janus was placed on life support systems for almost two days before being pronounced dead. Claiming that there was no sufficient evidence that Theresa Janus survived her husband, plaintiff Alojza Janus, Stanley's mother, brought this action for the proceeds of Stanley's $100,000 life insurance policy, which named Theresa as the primary beneficiary and plaintiff as the contingent beneficiary. Defendant Metropolitan Life Insurance Company paid the proceeds to defendant Jan Tarasewicz, Theresa's father and the administrator of her estate. The trial court found sufficient evidence that Theresa survived Stanley Janus. We affirm.

The facts of this case are particularly poignant and complex. Stanley and Theresa Janus had recently returned from their honeymoon when, on the evening of September 29, 1982, they gathered with other family members to mourn the death of Stanley's brother, Adam Janus, who had died earlier that day from what was later determined to be cyanide-laced Tylenol capsules. While the family was at Adam's home, Stanley and Theresa Janus unknowingly took some of the contaminated Tylenol. Soon afterwards, Stanley collapsed on the kitchen floor.

Theresa was still standing when Diane O'Sullivan, a registered nurse and a neighbor of Adam Janus, was called to the scene. Stanley's pulse was weak so she began cardiopulmonary resuscitation (CPR) on him. Within minutes, Theresa Janus began having seizures. After paramedic teams began arriving, Ms. O'Sullivan went into the living room to assist with Theresa. While she was working on Theresa, Ms. O'Sullivan could hear Stanley's "heavy and labored breathing." She believed

that both Stanley and Theresa died before they were taken to the ambulance, but she could not tell who died first.

Ronald Mahon, a paramedic for the Arlington Heights fire department, arrived at approximately 5:45 p.m. He saw Theresa faint and go into a seizure. Her pupils did not respond to light but she was breathing on her own during the time that he worked on her. Mahon also assisted with Stanley, giving him drugs to stimulate heart contractions. Mahon later prepared the paramedic's report on Stanley. One entry in the report shows that at 18:00 hours Stanley had "zero blood pressure, zero pulse, and zero respiration." However, Mahon stated that the times in the report were merely approximations. He was able to say that Stanley was in the ambulance en route to the hospital when his vital signs disappeared.

When paramedic Robert Lockhart arrived at 5:55 p.m., both victims were unconscious with nonreactive pupils. Theresa's seizures had ceased but she was in a decerebrate posture in which her arms and legs were rigidly extended and her arms were rotated inward toward her body, thus indicating severe neurological dysfunction. At that time, she was breathing only four or five times a minute and, shortly thereafter, she stopped breathing on her own altogether. Lockhart intubated them both by placing tubes down their tracheae to keep their passages open. Prior to being taken to the ambulance, they were put on "ambu-bags," which is a form of artificial respiration whereby the paramedic respirates the patient by squeezing a bag. Neither Stanley nor Theresa showed any signs of being able to breathe on their own while they were being transported to Northwest Community Hospital in Arlington Heights. However, Lockhart stated that when Theresa was turned over to the hospital personnel, she had a palpable pulse and blood pressure.

The medical director of the intensive care unit at the hospital, Dr. Thomas Kim, examined them when they arrived in the emergency room at approximately 6:30 p.m. Stanley had no blood pressure or pulse. An electrocardiogram detected electrical activity in Stanley Janus' heart, but there was no synchronization between his heart's electrical activity and its pumping activity. A temporary pacemaker was inserted in an unsuccessful attempt to resuscitate him. Because he never developed spontaneous blood pressure, pulse or signs of respiration, Stanley Janus was pronounced dead at 8:15 p.m. on September 29, 1982.

Like Stanley, Theresa Janus showed no visible vital signs when she was admitted to the emergency room. However, hospital personnel were able to get her heart beating on its own again, so they did not insert a pacemaker. They were also able to establish a measurable,

though unsatisfactory, blood pressure. Theresa was taken off the "ambu-bag" and put on a mechanical respirator. In Dr. Kim's opinion, Theresa was in a deep coma with "very unstable vital signs" when she was moved to the intensive care unit at 9:30 p.m. on September 29, 1982.

While Theresa was in the intensive care unit, numerous entries in her hospital records indicated that she had fixed and dilated pupils. However, one entry made at 2:32 a.m. on September 30, 1982, indicated that a nurse apparently detected a minimal reaction to light in Theresa's right pupil but not in her left pupil.

On September 30, 1982, various tests were performed in order to assess Theresa's brain function. These tests included an electroencephalogram (EEG) to measure electrical activity in her brain and a cerebral blood flow test to determine whether there was any blood circulating in her brain. In addition, Theresa exhibited no gag or cord reflexes, no response to pain or other external stimuli. As a result of these tests, Theresa Janus was diagnosed as having sustained total brain death, her life support systems then were terminated, and she was pronounced dead at 1:15 p.m. on October 1, 1982.

Death certificates were issued for Stanley and Theresa Janus more than three weeks later by a medical examiner's physician who never examined them. The certificates listed Stanley Janus' date of death as September 29, 1982, and Theresa Janus' date of death as October 1, 1982. Concluding that Theresa survived Stanley, the Metropolitan Life Insurance Company paid the proceeds of Stanley's life insurance policy to the administrator of Theresa's estate.

On January 6, 1983, plaintiff brought the instant declaratory judgment action against the insurance company and the administrators of Stanley and Theresa's estates, claiming the proceeds of the insurance policy as the contingent beneficiary of the policy. Also, the administrator of Stanley's estate filed a counterclaim against Theresa's estate seeking a declaration as to the disposition of the assets of Stanley's estate.

During the trial, the court heard the testimony of Ms. O'Sullivan, the paramedics, and Dr. Kim. There was also testimony that, while Theresa was in the intensive care unit, members of Theresa's family requested that termination of her life support system be delayed until the arrival of her brother, who was serving in the military. However, Theresa's family denied making such a request.

In addition, Dr. Kenneth Vatz, a neurologist on the hospital staff, was called as an expert witness by plaintiff. Although he never actually examined Theresa, he had originally read her EEG as part of hospital

routine. Without having seen her other hospital records, his initial evaluation of her EEG was that it showed some minimal electrical activity of living brain cells in the frontal portion of Theresa's brain. After reading her records and reviewing the EEG, however, he stated that the electrical activity measured by the EEG was "very likely" the result of interference from surrounding equipment in the intensive care unit. He concluded that Theresa was brain dead at the time of her admission to the hospital but he could not give an opinion as to who died first.

The trial court also heard an evidence deposition of Dr. Joseph George Hanley, a neurosurgeon, who testified as an expert witness on behalf of the defendants. Based on his examination of their records, Dr. Hanley concluded that Stanley Janus died on September 29, 1982. He further concluded that Theresa Janus did not die until her vital signs disappeared on October 1, 1982. His conclusion that she did not die prior to that time was based on: (1) the observations by hospital personnel that Theresa Janus had spontaneous pulse and blood pressure which did not have to be artificially maintained; (2) the instance when Theresa Janus' right pupil allegedly reacted to light; and (3) Theresa's EEG which showed some brain function and which, in his opinion, could not have resulted from outside interference.

At the conclusion of the trial, the court held that the evidence was sufficient to show that Theresa survived Stanley, but the court was not prepared to say by how long she survived him. Plaintiff and the administrator of Stanley's estate appeal. In essence, their main contention is that there is not sufficient evidence to prove that both victims did not suffer brain death prior to their arrival at the hospital on September 29, 1982.

Dual standards for determining when legal death occurs in Illinois were set forth in the case of *In re Haymer* (1983), 115 Ill. App. 3d 349, 450 N.E.2d 940. There, the court determined that a comatose child attached to a mechanical life support system was legally dead on the date he was medically determined to have sustained total brain death, rather than on the date that his heart stopped functioning. The court stated that in most instances death could be determined in accordance with the common law standard which is based upon the irreversible cessation of circulatory and respiratory functions. (115 Ill. App. 3d 349, 355.) If these functions are artificially maintained, a brain death standard of death could be used if a person has sustained irreversible cessation of total brain function. (115 Ill. App. 3d 349, 355.) In a footnote, the court stated that widely accepted characteristics of brain death include: (1) unreceptivity and unresponsivity to intensely painful stimuli;

(2) no spontaneous movement or breathing for at least one hour; (3) no blinking, no swallowing, and fixed and dilated pupils; (4) flat EEG's taken twice with at least a 24-hour intervening period; and (5) absence of drug intoxication or hyperthermia. (115 Ill. App. 3d 349, 354 n.9; see *Report of the Ad Hoc Committee of the Harvard Medical School to Examine the Definition of Brain Death: A Definition of Irreversible Coma* 205 J.A.M.A. 337 (1968); *Lovato v. District Court* (1979), 198 Colo. 419, 426-27, 601 P. 2d 1072, 1076-77; see also *Report of the Medical Consultants on the Diagnosis of Death to the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research*, 246 J.A.M.A. 2184 (proposing other criteria).) However, the court refused to establish criteria for determining brain death because it noted that the advent of new research and technologies would continue to change the tests used for determining cessation of brain function. (*In re Haymer* (1983), 115 Ill. App. 3d 349, 354-55 n.9.) Instead, the court merely required that the diagnosis of death under either standard must be made in accordance with "usual and customary standards of medical practice." 115 Ill. App. 3d 349, 355.

■ Even though *Haymer* was decided after the deaths of Stanley and Theresa, we find that the trial court properly applied the *Haymer* standards under the general rule that a civil case is governed by the law as it exists when judgment is rendered, not when the facts underlying the case occur. (See *GTE Automatic Electric, Inc. v. Allphin* (1976), 38 Ill. App. 3d 910, 913-14, 349 N.E.2d 654, *aff'd* (1977), 68 Ill. 2d 326; *In re Estate of Mertes* (1975), 34 Ill. App. 3d 557, 559, 340 N.E.2d 25.) The application of *Haymer* is not unfair, since the treating physicians made brain-death diagnoses at the time of the deaths, and the parties presented evidence at trial regarding brain death.

Regardless of which standard of death is applied, survivorship is a fact which must be proved by a preponderance of the evidence by the party whose claim depends on survivorship. (*In re Estate of Moran* (1979), 77 Ill. 2d 147, 150, 395 N.E.2d 579.) The operative provisions of the Illinois version of the Uniform Simultaneous Death Act provides in pertinent part:

> "If the title to property or its devolution depends upon priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously and there is no other provision in the will, trust agreement, deed, contract of insurance or other governing instrument for distribution of the property different from the provisions of this Section:
>
> (a) The property of each person shall be disposed of as if he had survived.

* * *

(d) If the insured and the beneficiary of a policy of life or accident insurance have so died, the proceeds of the policy shall be distributed as if the insured had survived the beneficiary." Ill. Rev. Stat. 1981, ch. 110½, par. 3—1.

■■■ In cases where the question of survivorship is determined by the testimony of law witnesses, the burden of sufficient evidence may be met by evidence of a positive sign of life in one body and the absence of any such sign in the other. (*In re Estate of Lowrance* (1978), 66 Ill. App. 3d 159, 162, 383 N.E.2d 703; *Prudential Insurance Co. v. Spain* (1950), 339 Ill. App. 476, 90 N.E.2d 256.) In cases such as the instant case, where the death process is monitored by medical professionals, their testimony as to "the usual and customary standards of medical practice" will be highly relevant when considering what constitutes a positive sign of life and what constitutes a criteria for determining death. (See *In re Haymer* (1983), 115 Ill. App. 3d 349.) Although the use of sophisticated medical technology can also make it difficult to determine when death occurs, the context of this case does not require a determination as to the exact moment at which the decedents died. Rather, the trial court's task was to determine whether or not there was sufficient evidence that Theresa Janus survived her husband. Our task on review of this factually disputed case is to determine whether the trial court's finding was against the manifest weight of the evidence. (See *Fransen Construction Co. v. Industrial Com.* (1943), 384 Ill. 616, 628-29, 52 N.E.2d 241; *In re Estate of Adams* (1952), 348 Ill. App. 115, 121, 108 N.E.2d 32.) We hold that it was not.

In the case at bar, both victims arrived at the hospital with artificial respirators and no obvious vital signs. There is no dispute among the treating physicians and expert witnesses that Stanley Janus died in both a cardiopulmonary sense and a brain-death sense when his vital signs disappeared en route to the hospital and were never reestablished. He was pronounced dead at 8:15 p.m. on September 29, 1982, only after intensive procedures such as electro-shock, medication, and the insertion of a pacemaker failed to resuscitate him.

In contrast, these intensive procedures were not necessary with Theresa Janus, because hospital personnel were able to reestablish a spontaneous blood pressure and pulse which did not have to be artificially maintained by a pacemaker or medication. Once spontaneous circulation was restored in the emergency room, Theresa was put on a mechanical respirator and transferred to the intensive care unit. Clearly, efforts to preserve Theresa Janus' life continued after more intensive efforts on Stanley's behalf had failed.

It is argued that the significance of Theresa Janus' cardiopulmo-nary functions, as a sign of life, was rendered ambiguous by the use of artificial respiration. In particular, reliance is placed upon expert testi-mony that a person can be brain dead and still have a spontaneous pulse and blood pressure which is indirectly maintained by artificial respiration. The fact remains, however, that Dr. Kim, an intensive care specialist who treated Theresa, testified that her condition in the emer-gency room did not warrant a diagnosis of brain death. In his opinion, Theresa Janus did not suffer irreversible brain death until much later, when extensive treatment failed to preserve her brain function and vi-tal signs. This diagnosis was confirmed by a consulting neurologist af-ter a battery of tests were performed to assess her brain function. Dr. Kim denied that these examinations were made merely to see if brain death had already occurred. At trial, only Dr. Vatz disagreed with their finding, but even he admitted that the diagnosis and tests performed on Theresa Janus were in keeping with the usual and customary stand-ards of medical practice.

There was also other evidence presented at trial which indicated that Theresa Janus was not brain dead on September 29, 1982. There-sa's EEG, taken on September 30, 1982, was not flat but rather it showed some delta waves of extremely low amplitude. Dr. Hanley con-cluded that Theresa's EEG taken on September 30 exhibited brain ac-tivity. Dr. Vatz disagreed. Since the trier of fact determines the credi-bility of expert witnesses and the weight to be given to their testimony (*Anderson v. General Grinding Wheel Corp.* (1979), 74 Ill. App. 3d 270, 281, 393 N.E.2d 9), the trial court in this case could have reasona-bly given greater weight to Dr. Hanley's opinion than to Dr. Vatz'. In addition, there is evidence that Theresa's pupil reacted to light on one occasion. It is argued that this evidence merely represents the subjec-tive impression of a hospital staff member which is not corroborated by any other instance where Theresa's pupils reacted to light. However, this argument goes to the weight of this evidence and not to its admis-sibility. While these additional pieces of neurological data were by no means conclusive, they were competent evidence which tended to sup-port the trial court's finding, and which also tended to disprove the contention that these tests merely verified that brain death had already taken place.

In support of the contention that Theresa Janus did not survive Stanley Janus, evidence was presented which showed that only Theresa Janus suffered seizures and exhibited a decerebrate posture shortly after ingesting the poisoned Tylenol. However, evidence that persons with these symptoms tend to die very quickly does not prove

that Theresa Janus did not in fact survive Stanley Janus. Moreover, the evidence introduced is similar in nature to medical presumptions of survivorship based on decedents' health or physical condition, which are considered too speculative to prove or disprove survivorship. (See *In re Estate of Moran* (1979), 77 Ill. 2d 147, 153.) Similarly, we find no support for the allegation that the hospital kept Theresa Janus on a mechanical respirator because her family requested that termination of her life support systems be delayed until the arrival of her brother, particularly since members of Theresa's family denied making such a request.

■ In conclusion, we believe that the record clearly established that the treating physicians' diagnoses of death with respect to Stanley and Theresa Janus were made in accordance with "the usual and customary standards of medical practice." Stanley Janus was diagnosed as having sustained irreversible cessation of circulatory and respiratory functions on September 29, 1982. These same physicians concluded that Theresa Janus' condition on that date did not warrant a diagnosis of death, and, therefore, they continued their efforts to preserve her life. Their conclusion that Theresa Janus did not die until October 1, 1982, was based on various factors including the restoration of certain of her vital signs as well as other neurological evidence. The trial court found that these facts and circumstances constituted sufficient evidence that Theresa Janus survived her husband. It was not necessary to determine the exact moment at which Theresa died or by how long she survived him, and the trial court properly declined to do so. Viewing the record in its entirety, we cannot say that the trial court's finding of sufficient evidence of Theresa's survivorship was against the manifest weight of the evidence.

Because of our disposition of this case, we need not and do not consider whether the date of death listed on the victims' death certificate should be considered "facts" which constitute *prima facie* evidence of the date of their deaths. See Ill. Rev. Stat. 1981, ch. 111½, par. 73—25; *People v. Fiddler* (1970), 45 Ill. 2d 181, 184-86, 258 N.E.2d 359.

Accordingly, there being sufficient evidence that Theresa Janus survived Stanley Janus, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.