*In re* ESTATE OF THORNTON R.L. SEWART, Deceased (Irene B. Popham, Indiv. and as Independent Adm'r of the Estate of Edward J. Popham, Deceased, Plaintiffs-Appellants, v. Virginia Taff *et al.*, Defendants-Appellees).

First District (5th Division)   No. 1—89—1946

Opinion filed December 27, 1991.—Rehearing denied January 29, 1992.

Bruce C. Davidson, of Chicago, for appellant.

Henry Thrush Synek, of Chicago, and Stephen B. Engelman and Mark S. Smith, both of Skokie, for appellees.

JUSTICE GORDON delivered the opinion of the court:

Plaintiff, Irene Popham, individually and as administrator of the estate of her late husband, Edward Popham, filed a two-count complaint for declaratory relief, naming as defendants Virginia Taff, the administrator of the estate of Thornton R.L. Sewart, the beneficiaries under Sewart's will, and several other relatives of Sewart. Both parties filed motions for summary judgment, although plaintiff withdrew her motion. Defendants' motion was granted as to both counts of the complaint, and plaintiff now appeals. For the reasons set forth below, we reverse the grant of summary judgment as to count I, and affirm as to count II.

The testator, Thornton R.L. Sewart, was hospitalized in late April 1985 and pronounced dead in a death certificate on May 6, 1985. As discussed below, the exact date of Sewart's death is disputed by the parties. Edward Popham died on May 4, 1985. Sewart left a will which provided for $1,000 bequests to three specified charities. He also left $1 each to his sister and brother. The remainder of his estate was left to "my good friend, EDWARD J. POPHAM." There was no provision in Sewart's will for the disposition of his residuary estate should Edward Popham predecease Sewart.

Plaintiff in this action is the widow of Edward Popham. Defendants are the administrator of Sewart's will, the named beneficiaries under the will (excluding Mr. Popham) and Sewart's heirs at law.

In count I of the complaint, plaintiff alleged that she and her husband rendered various services for the testator, Thornton Sewart, after Sewart became unable to fully care for himself. In return, Sewart orally agreed that he would devise and give his property to Edward Popham. As a result, plaintiff contended, there was a valid contract between plaintiff, her husband and Sewart, which has been fully performed by the Pophams. Accordingly, she sought a declaration that a valid contract existed between plaintiff, her husband, and Sewart, and that she and her husband's estate are entitled to all of the property owned by Sewart at the time of his death, and that the defendant, the

4

administrator of Sewart's estate, is holding that property as trustee for plaintiff and her husband's estate.

Count II sought a declaration that Sewart predeceased Edward Popham. Plaintiff alleged that Sewart fell and sustained a fatal head injury on April 29, 1985. Sewart was in a coma when he was taken to St. Elizabeth's Hospital and placed on life support systems. Plaintiff alleged upon information and belief that although a mechanical life support system was able to cause a heartbeat in Sewart, he in fact suffered a total and irreversible cessation of all functions of his brain and was legally dead prior to May 6, 1985.

Plaintiff filed a motion for summary judgment on count II, in support of which she submitted her own affidavit. In that affidavit, plaintiff stated that she had discussed Sewart's condition with Dr. Leslie Schaffer, Sewart's treating physician, and that on May 3, 1985, Dr. Schaffer told her that he thought a test for brain activity, scheduled for May 6, would probably show no such activity.

Plaintiff also submitted the deposition testimony of Dr. Schaffer. In that deposition, plaintiff's attorney stated for the record that Dr. Schaffer was not being deposed by the plaintiff as an expert, but as an occurrence witness.

Briefly summarizing the relevant portions of that deposition, Dr. Schaffer testified that when first seen by him on April 29, 1985, Sewart was deeply comatose. Schaffer performed a craniotomy and "removed a hemorrage" from Sewart's head. Following the surgery, Sewart's vital signs were stable, and he was placed on a mechanical ventilator.

Referring to his physician's progress notes to refresh his recollection, Schaffer testified that as shown in his notes, on May 1, Sewart responded to painful stimuli. On May 2, his response to painful stimuli was decreased, and on May 4, Sewart was "unresponsive." There was no notation for May 3. According to his records, the last indicated response of Sewart's pupils to light stimulus was on April 30. When asked Sewart's condition on May 6, Schaffer replied "he died on May 6."

On May 4, an electroencephalogram (EEG) was ordered, to be performed on May 6. The test was never performed, however, since Sewart was pronounced dead on the 6th.

When questioned by defense counsel, Schaffer said that based on the entire hospital record, he could not tell whether Sewart's brain stem was dead (at any time prior to May 6).

Defendants filed a response to plaintiff's motion for summary judgment. Included with that response were the affidavit and medical

report of Dr. Michael J. Caron, a neurosurgeon at Loyola University Medical Center, retained by defendants as an expert for purposes of the litigation to review the medical records of Sewart, "specifically to delineate evidence which would indicate brain death prior to his demise on May 6, 1985." In his report, Dr. Caron stated:

> "In summary, there is no evidence of a physical examination of Mr. Sewart, by a physician, which unquestionably establishes the presence of brain death."

Caron went on to discuss the elements of brain death, using the criteria established by the *ad hoc* committee of the Harvard Medical School, with specific references to Sewart's medical records including the records of his treating physician, Dr. Schaffer. He concluded that only one element, unresponsive coma, was clearly evident in the Sewart case. The second element, apnea, or the absence of spontaneous breathing, was inconclusive. Sewart was on a ventilator which would have suppressed the stimulus for spontaneous breathing. No test for apnea was made.

In regard to the third element, the absence of cephalic reflexes, Caron noted that the only cephalic reflex mentioned in Sewart's record was the lack of pupillary reaction to light. Other cranial nerves which would indicate brain activity may have been functional.

Absence of spinal reflexes is the fourth criterion, and is tested by movement of the extremities in response to pain. Although Dr. Schaffer noted that there was no response on May 4, a nursing note the same day indicated occasional movement of arms, legs, and the body. Thus, Caron concluded, it was unclear when spinal cord activity was truly lost.

The fifth requirement is an isoelectric EEG. This test was never performed.

Absence of drug intoxication and hypothermia is the sixth criterion. Sewart was in a state of persistent hypothermia, and was also on the drug phenytoin, a nervous system depressant used to prevent seizures. Caron stated that in seriously ill patients phenytoin may build to levels which will confuse a determination of brain death. No tests were made to determine the level of this drug in Sewart. In addition, an EEG to determine brain death done while a patient was on phenytoin would be invalid.

The final Harvard criterion is persistence of these conditions for at least 24 hours. Caron stated that "conditions unquestionably consistent with brain death were never really established in the record."

Dr. Caron concluded that "it is impossible from the medical record to establish the unquestionable presence of brain death prior to his

death from cardiopulmonary arrest, secondary to pneumonia, on May 6, 1985.''

Plaintiff later withdrew her motion for summary judgment on count II. Defendants then submitted their motion, later amended, for summary judgment on both counts. In regard to count I, defendants submitted excerpts from a deposition they had taken of the plaintiff. By her statements, defendants contended, plaintiff conceded that there was no agreement between Sewart and the Pophams, but rather mere declarations of testamentary intent based on affection.

As to count II, defendants relied on the affidavit and medical report of their expert, Dr. Caron, originally submitted in response to plaintiff's summary judgment motion.

In plaintiff's response to defendants' summary judgment motion on count I, she submitted additional excerpts from her deposition, arguing that defendants had taken her statements out of context. Regarding count II, plaintiff argued that the deposition of Dr. Schaffer, submitted earlier in connection with plaintiff's summary judgment motion, provided substantial support to the allegation that Sewart suffered brain death prior to May 4.

In addition, plaintiff submitted the discovery deposition of defendants' expert, Dr. Caron. In that deposition, taken by plaintiff's attorney, Dr. Caron was presented with the following hypothetical question:

> ''You have evidence on Friday from all of your observations of pain tests, all the standard things that you can do without a more sophisticated test and you conclude on a Friday there is probably no brain activity here and you order these tests to be done on Monday.
>
> Now, Monday, you have the test done and everything is negative; there is no evidence whatsoever, or perhaps, over the weekend, he terminates himself, just all functions fail, regardless.
>
> Now, what I am saying is: isn't it possible that on Friday when you made the observations, that he was in fact dead?''

Dr. Caron responded that it might be possible, but such a determination would have to be made on a case-by-case basis. Until confirmatory tests are made, however, all the doctors would have is a clinical suspicion, and the patient is not considered dead.

Dr. Caron reemphasized the statement he had made in his affidavit that, from the entire hospital record, in his opinion it was impossible to know when brain death occurred in Sewart, or in fact if brain death occurred prior to May 6 when Sewart was removed from me-

chanical life support systems following his cardiac arrest. Based on the record, Dr. Caron said that he could not have pronounced Sewart dead prior to May 6 when he suffered cardiac arrest.

Counsel for the plaintiff later asked Dr. Caron whether he could "testify, to a reasonable degree of medical certainty, that this patient was not dead until the death certificate was issued, not brain dead? Is there a way to tell that he was not brain dead?" The doctor responded that the documentation was not there to make such a determination, and went on to note several entries in the medical records which suggested that Sewart in fact was not brain dead. On May 3, the anesthesiologist saw one of his pupils react to light. On May 4, a nursing note indicated "occasional movements of arms and legs and body." On May 5, nurses saw his arms and legs move. On May 5, the entry said "neuro status unchanged," which Dr. Caron interpreted as meaning that his arms were seen to move. Also on the 5th, the notes included "body movement noted" and "comatose with jerky movement of left leg, when stimulated." Regarding the "jerky movement" of Sewart's leg, Dr. Caron conceded that such movement could be caused by spinal cord reflexes rather than brain activity, although it was impossible to tell which caused the movement.

The trial court, after consideration of the parties' memoranda, the depositions and affidavits of the doctors and oral argument, found that there were no genuine issues of material fact, and therefore granted defendants' motion. Plaintiff now appeals.

OPINION

Section 2—1005(c) of the Code of Civil Procedure provides that summary judgment "shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c).) In determining the existence of a genuine issue of material fact, courts must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 467.) A genuine issue of material fact exists if, where the facts are undisputed, "a fair-minded person may draw different inferences from those undisputed facts." (*Consolino v. Thompson* (1984), 127 Ill. App. 3d 31, 33, 468 N.E.2d 422.) The inference drawn must be a reasonable one, and the amount of evidence required to draw such an inference "will depend entirely upon the nature of the evidence offered in the case at hand." (*Consolino*, 127

Ill. App. 3d at 33.) The primary issue on appeal from a summary judgment is whether "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the moving party is entitled to a judgment as a matter of law." *West v. Kirkham* (1991), 207 Ill. App. 3d 954, 957, 566 N.E.2d 523.

The party seeking summary judgment may meet its initial burden of persuasion by presenting facts which, if uncontradicted, would entitle it to judgment as a matter of law. (*Venus v. O'Hara* (1984), 127 Ill. App. 3d 19, 468 N.E.2d 405.) Once the party seeking the summary judgment produces such evidence, the burden of production shifts to the party opposing the motion, who may not rely solely on allegations in the complaint, but is required to come forth with some facts which create a material issue of fact. (*Carruthers v. B.C. Christopher & Co.* (1974), 57 Ill. 2d 376, 313 N.E.2d 457.) Although a plaintiff opposing a motion for summary judgment need not prove her case at this point, she must provide some factual basis which would arguably entitle her to a judgment under the applicable law. (*Kimbrough v. Jewel Cos.* (1981), 92 Ill. App. 3d 813, 416 N.E.2d 328; *Cuthbert v. Stempin* (1979), 78 Ill. App. 3d 562, 396 N.E.2d 1197.) If the respondent fails to produce such evidence, summary judgment is properly granted. *Kimbrough v. Jewel Cos.*, 92 Ill. App. 3d 813, 416 N.E.2d 328.

As to count I, defendants contend that there was no evidence of a contract to make a will between Sewart and Mr. Popham, and that if such a contract existed, it was satisfied when Sewart named Edward Popham as beneficiary in his will. They contend that the testator, Sewart, said only that, due to friendship and gratitude, he would name Mr. Popham the beneficiary under his will, and that such statements are insufficient to create an enforceable oral contract to make a will. In support of this argument, defendants quote portions of Mrs. Popham's deposition:

"Q. So, as far as you know, there was no agreement that he would get anything out of Thornton's property if he helped Thornton out?

A. That wasn't the agreement. There was no agreement, no, sir.

Q. I see. It was just expressions by Mr. Thornton Sewart?

A. Right, gratitude.

Q. That is what he's going to do out of gratitude; is that correct?

A. Yes, and friendship."

Accordingly, defendants argue, plaintiff herself admitted that there was no contract and therefore there are no genuine issues of material fact as to count I, and they were properly granted summary judgment on that count.

Plaintiff responds that the quoted portion of her deposition was taken out of context, and must be read in conjunction with her testimony immediately preceeding the excerpt submitted by defendants. Plaintiff submitted the following additional excerpt from her testimony:

"Q. Okay. Now, in your Answers to Interrogatories that were given to you and that were actually frame worked, based on your complaint, you have made certain answers concerning this agreement that you talked about; and you said that for all of the services rendered to Thor[n]ton and duly rendered to him, Thor[n]ton had orally agreed that he would devise and give his property to Edward Popham except certain small bequests.

Now, when did he orally agree to do this, Thor[n]ton, when did he orally agree?

A. I don't remember.

Q. You don't remember. Obviously it was before his death?

A. Yes, sir.

Q. Was it before 1976?

A. Oh, yes, sir.

* * *

Q. And you weren't there when it was made?

A. When what was made?

Q. The oral agreement that you referred to in Paragraph three?

A. It wasn't just the one time.

* * *

Q. He was talking about it, right?

A. Oh, yes, sir.

Q. Thor[n]ton was talking about it?

A. Yes.

Q. But your husband wasn't talking about it?

A. Talking about what?

Q. The agreement that he's going to get everything?

A. I can't answer with a yes or no because Edward was not that kind of a man. He wouldn't do it so he would be in on an—

Q. So as far as you know, there was no agreement that he would get anything out of Thor[n]ton's property if he helped Thornton out?

A. That wasn't the agreement. There was no agreement, no, sir."

According to plaintiff, this line of questioning assumed the existence of an agreement, and the questions and answers quoted by defendants in their excerpt pertained to evidence of the agreement. Therefore, plaintiff urges, her testimony when taken as a whole does not negate the existence of a contract despite her apparent disclaimer of an agreement when she said "There was no agreement, no sir."

■■ As noted earlier, summary judgment should be granted only when there is no issue of material fact and the facts before the court are capable of only one reasonable interpretation. Viewing Mrs. Popham's statements and the other material before the court liberally in her favor as we must, we find that the trial court erred in granting defendants' motion. While Mrs. Popham's statement "There was no agreement, no sir" may be read as an admission that there was no express agreement between her husband and Sewart, her statements do not appear to be a total abandonment of her position that there was an agreement between Sewart and the Pophams, particularly when defendants' excerpt and plaintiff's excerpt of the colloquy are read together as the testimony was given. See *In re Estate of Mallas* (1968), 100 Ill. App. 2d 88, 241 N.E.2d 482 (discussed below).

In response to a question about when the alleged agreement was made, her inability to give a specific date does not necessarily imply that there was no agreement. She did say that the agreement was made before 1976 (the year Sewart's will was executed). (See *In re Estate of Niehaus* (1950), 341 Ill. App. 454, 460, 94 N.E.2d 525 (when an agreement exists and is reaffirmed several times over a period of years, the exact date of its origin is not material).) She also testified that the alleged agreement was made on more than one occasion, and that Sewart was talking about the agreement, statements which all affirm rather than recant her contention that there was an agreement. Her statement that "there was no agreement" was in response to a specific question. When read in context with the rest of her testimony, it can be viewed as a disclaimer by a layperson without demonstrated legal sophistication that there was a business-like agreement in which the *quid pro quo* was fully expressed and articulated, and not as a negation of her previous statements that there was an understanding reached with the testator.

In *In re Estate of Mallas* (1968), 100 Ill. App. 2d 88, 241 N.E.2d 482, a contract was found on facts almost identical to those in this case. There, Celia Stolpe performed services for the decedent and his wife. Stolpe was not related to the decedent. The decedent had expressed his appreciation, gratitude and intention to pay Stolpe for her efforts. A will was prepared leaving decedent's home to Stolpe, but it was never executed. Stolpe testified that the decedent never offered or promised to pay for the services she rendered and that he never told her he would reimburse her. Moreover, she never asked for payment.

The trial court denied her claim, finding that there was no express contract, and that "the presumption of an implied contract (to pay for services where there is no relationship between the parties) would not arise because there was 'positive testimony by the claimant herself, that there never was, at any time, any ... agreement to pay.' " (*Mallas*, 100 Ill. App. 2d at 91-92.) Upon claimant's motion to vacate the order, the court refused to do so on the grounds that "the presumption of an implied contract had been overcome by the claimant's own testimony that Mallas had not promised or offered to pay or reimburse her and that she had not asked him for payment or told him of her expectation of payment." *Mallas*, 100 Ill. App. 2d at 92.

The appellate court reversed, finding that claimant had established an implied contract. "Her testimony that she had no definite understanding with the decedent did not negate her contention that an agreement was implied by their acts, expressions and conduct. Second, her testimony did not destroy the presumption arising from the acceptance of her services." (*Mallas*, 100 Ill. App. 2d at 92.) The court went on to set forth the conditions under which a contract will be implied:

> " 'Where no kin or family relationship exists between the parties, and one accepts and retains the beneficial results of another's services, which were rendered at his own insistence and request and which he had no reason to suppose were gratuitous, the law will imply liability for such services in such an amount as they are reasonably worth.' *Floyd v. Smith's Estate*, 320 Ill. App. 171, 50 N.E.2d 254 (1943), cited in *In re Estate of McWain*, 77 Ill. App. 2d 359, 222 N.E.2d 576 (1966) and *In re Estate of Brumshagen*, 27 Ill. App. 2d 14, 169 N.E.2d 112 (1960)." *Mallas*, 100 Ill. App. 2d at 92.

See also *In re Estate of Milborn* (1984), 122 Ill. App. 3d 688, 461 N.E.2d 1075 (when services rendered by one person for another, and are knowingly and voluntarily accepted, law presumes such services

were given and received in expectation of payment); *Frey v. Belleville News-Democrat, Inc.* (1978), 64 Ill. App. 3d 495, 381 N.E.2d 705 (implied in fact contract inferred from circumstances, conduct and acts of parties showing an intention to be bound); *In re Estate of Pomeroy* (1974), 21 Ill. App. 3d 648, 316 N.E.2d 231 (where no family relationship exists between the parties and one accepts the services of another with no reason to suppose the services to be gratuitous, law implies a contract for those services in the amount they are reasonably worth).

Applying these principles to the instant case, we find that plaintiff has produced sufficient evidence to create an inference of an implied contract. The Pophams are not related to Sewart. They performed services for him, which he accepted, thus raising the presumption of an agreement to pay for those services. The decedent expressed his gratitude and appreciation for their services, which although not sufficient by itself to prove an oral contract, does not negate the presumption that a contract existed. Although Mrs. Popham disclaimed that there was a specific agreement regarding payment, this should not suffice upon a motion for summary judgment to negate the inference that an agreement was implied by their conduct, acts and expressions.

Accordingly, we find that sufficient facts have been presented to create an inference that an implied contract existed. It was not necessary for plaintiff to prove her case by a preponderance of the evidence at this stage of the proceedings. Summary judgment may only be granted where the facts are capable of only one reasonable inference, which is not the case here. *Consolino v. Thompson* (1984), 127 Ill. App. 3d 31, 468 N.E.2d 422.

Defendants also contend that if there was a contract, it was satisfied when the testator named Edward Popham as a beneficiary under his will. Plaintiff, however, in sworn response to interrogatories filed with the court and referred to in her deposition, stated that both she and her husband rendered services to Sewart. (See *Estate of Henderson v. W.R. Grace Co.* (1989), 185 Ill. App. 3d 523, 541 N.E.2d 805 (responses to interrogatories may be considered in summary judgment determination). See also Supreme Court Rule 213 (134 Ill. 2d R. 213 (answers to interrogatories may be used in evidence to the same extent as discovery depositions).) She said that in the fall or winter of 1975, Sewart became unable to fully care for himself, was unable to do any physical work, and Edward and Irene Popham rendered various services for Sewart, including cleaning house, making repairs to Sewart's home, shovelling snow, cutting grass and taking Sewart out for rides. As both Irene and Edward Popham performed these ser-

vices for Sewart, an inference may be raised that the implied agreement between Sewart and the Pophams was to provide for both Edward and Irene Popham. The naming of Edward Popham alone as beneficiary, without some provision for the benefit of Irene Popham, would not satisfy such an agreement if those were its terms.

Under defendants' argument that the agreement was simply to name Edward Popham in the will and was therefore satisfied, we would reach the incongruous result wherein plaintiff would have been in a better position had her husband been omitted from the will entirely. Had that been the situation, she would have had a claim for damages for breach of contract, instead of a completed contract to make a will under which no property in fact passed. See *In re Estate of Johnson* (1945), 389 Ill. 425, 429, 59 N.E.2d 825 ("Where there is a breach of the contract to make the bequest, the remedy is a claim against the estate in the nature of a claim for damages for such breach"). See also *In re Estate of Greiner* (1952), 412 Ill. 591, 107 N.E.2d 836; *In re Guest's Estate* (1962), 35 Ill. App. 2d 434, 183 N.E.2d 194.

■ Moreover, the deposition excerpt submitted by defendants as their sole support for summary judgment on count I does not suffice to establish the specific terms of any implied in fact agreement that may by inference be deemed to exist between the testator and the Pophams. If anything it is merely sufficient to establish a disclaimer by Mrs. Popham of an express agreement. As previously noted, the movant for summary judgment has the initial burden of persuasion to present facts which, if uncontradicted, would entitle it to a judgment as a matter of law. (*Venus v. O'Hara* (1984), 127 Ill. App. 3d 19, 468 N.E.2d 405.) Here defendants' submissions fail to meet their initial burden of persuasion to establish that the terms of the implied agreement merely require the mechanical designation of Edward Popham in the will as a beneficiary under the will without providing for the contingency of his predeceasing the testator so as to assure an actual transfer of his property to Edward Popham and his wife Irene.

Only if the movants meet their initial burden does the respondent have a burden to make counter submissions. (*Becovic v. Harris Trust & Savings Bank* (1984), 128 Ill. App. 3d 107, 469 N.E.2d 1379 (only where party seeking summary judgment had made an evidentiary showing which refutes the allegations in the complaint must the party opposing the motion make counter submissions).) As defendants have not met their initial burden, the issue pertaining to the terms of the implied agreement is still controlled by count I of the pleadings, pur-

suant to which a viable contract claim, albeit under an implied contract theory, cannot be foreclosed.

Accordingly, for all the foregoing reasons, the grant of summary judgment as to count I is reversed.

As to count II, defendants rely upon the death certificate as evidence that Sewart died on May 6, 1985. A death certificate is *prima facie* evidence of the facts contained therein. (Ill. Rev. Stat. 1987, ch. 111½, par. 73—25(6).) They contend, therefore, that they have met their burden as movants for summary judgment, and it was incumbent upon the plaintiff to provide expert medical testimony to raise an inference that Sewart predeceased Mr. Popham.

Plaintiff's opposition to defendants' summary judgment motion is primarily predicated on Dr. Schaffer's factual testimony in his deposition. Conceding that Dr. Schaffer was "highly averse" to concluding that Sewart died before May 6, plaintiff nevertheless contends that there is sufficient evidence in his deposition to support plaintiff's position that Sewart died before he was pronounced dead on May 6, and to raise the inference that Sewart predeceased Mr. Popham, notwithstanding the fact that Dr. Schaffer offered no such opinion.

Specifically, plaintiff relies on the fact that Dr. Schaffer stated that no EEG was taken, although one had been ordered on May 4, to be performed on May 6. This, plaintiff contends, supports her position that Schaffer thought, or at least suspected, that Sewart was brain dead prior to May 6, and ordered the test to confirm his suspicion. Moreover, plaintiff points to Dr. Schaffer's testimony regarding Sewart's response to painful stimuli. Sewart responded to such stimuli on May 1, had a decreased response on May 2, and was "unresponsive" on May 4, with no indication in the records on May 3. In addition, the last response of the pupils to light stimuli was on April 30.

It is plaintiff's position that these facts in Dr. Schaffer's deposition are sufficient to raise an inference that Sewart suffered brain death prior to Popham's death on May 4, and thereby create a genuine issue of material fact sufficient to withstand a motion for summary judgment, without submitting an evaluation by an expert who is qualified to render an opinion as to the time of Sewart's brain death. Plaintiff contends that expert opinion on this point is not necessary, arguing that laymen should be deemed capable of drawing their own inference on this issue.

There are dual standards in this State for determining death. "[A] person is legally dead if he or she had sustained either (1) irreversible cessation of total brain function[s], according to usual and customary standards of medical practice, or (2) irreversible cessation of circulatory

and respiratory functions according to usual and customary standards of medical practice." (*In re Haymer* (1983), 115 Ill. App. 3d 349, 355, 450 N.E.2d 940, 954.) When circulatory and respiratory functions are mechanically maintained, the "irreversible cessation of total brain function[s]" or brain death standard may be used. (*Janus v. Tarasewicz* (1985), 135 Ill. App. 3d 936, 940, 482 N.E.2d 418.) Although the courts have refused to establish specific criteria for a diagnosis of brain death due to the changing nature of new technologies which could render any such criteria outdated, they have required that a diagnosis of brain death be made in accordance with the "usual and customary standards of medical practice." (*Janus*, 135 Ill. App. 3d at 941, citing *Haymer*, 115 Ill. App. 3d at 354 n.9.) In *Janus*, the court considered the criteria established by the *ad hoc* committee of the Harvard Medical School, the same criteria discussed by Dr. Caron in his affidavit and deposition.

■ In this case, the controlling question was whether Sewart suffered brain death prior to his cardiac arrest on May 6. The issue before this court, therefore, is whether expert opinion is necessary for a trier of fact, under the facts of this case, to form an opinion that Sewart died prior to Mr. Popham's death. If an expert opinion is necessary, then summary judgment in favor of defendants was proper as plaintiff has not come forth with an expert opinion in support of her position. (*Kosten v. St. Anne's Hospital* (1985), 132 Ill. App. 3d 1073, 478 N.E.2d 464; *Stevenson v. Naughton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d 53; *Sanders v. Frost* (1969), 112 Ill. App. 2d 234, 251 N.E.2d 105.) Although neither party has cited any cases which specifically answer the question of whether expert medical opinion is necessary to a determination of brain death, our analysis of the case law regarding the necessity of expert testimony in other cases convinces us that it is required here.

Expert opinion testimony is required where more than common knowledge and experience are needed to understand the issues and to form an opinion. (*Stevenson v. Naughton* (1979), 71 Ill. App. 3d 831, 390 N.E.2d 53. See, *e.g., Pacific Employers Insurance Co. v. Industrial Accident Comm'n* (1941), 47 Cal. App. 2d 494, 118 P.2d 334 (pathological cause of physical condition (ulcer) is scientific question which requires expert testimony); *Lincoln Income Life Insurance Co. v. Mann* (1944), 297 Ky. 681, 180 S.W.2d 877 (expert testimony required to establish existence of heart disease).) Moreover, expert testimony is generally needed to establish the benchmark standard of care because jurors are unskilled in the practice of medicine and would be unable without medical evidence to determine any lack of necessary scientific skill. See, *e.g., Purtill v. Hess* (1986), 111 Ill. 2d 229, 489 N.E.2d 867 (negligent diagnosis and treatment of rectovaginal fistulae); *Walski v. Tiesenga* (1978), 72

Ill. 2d 249, 381 N.E.2d 279 (failure to identify left recurrent laryngeal nerve during surgery); *Thompson v. Webb* (1985), 138 Ill. App. 3d 629, 486 N.E.2d 326 (negligent diagnosis of cancer).

Expert testimony is not required when a layman will have no difficulty appraising the situation. (*Graham v. St. Luke's Hospital* (1964), 46 Ill. App. 2d 147, 196 N.E.2d 355.) " 'The rule is that expert testimony is not required if the negligence is so grossly apparent or the treatment is of such a common occurrence that a layman would have no difficulty appraising it. [Citations.] The rule has been applied to cases involving anesthesia, tonsillectomy, X rays and in some cases injections.' " *Sanders v. Frost* (1969), 112 Ill. App. 2d 234, 240, 251 N.E.2d 105, quoting *Graham v. St. Luke's Hospital* (1964), 46 Ill. App. 2d 147, 158, 196 N.E.2d 355.

A diagnosis of brain death requires that several factors be evaluated, as discussed by Dr. Caron in his affidavit and by the courts in *Janus* and *Haymer*. These include unresponsive coma, apnea, absence of cephalic reflexes, absence of spinal reflexes, isoelectric EEG and absence of drug intoxication, factors which are clearly beyond the scope of the lay person's knowledge. How can a lay person, whether judge or juror, be expected to reach a cogent and reliable conclusion from technically complex symptoms such as these without the assistance of an expert's knowledge of the brain's function and pathology? Clearly, more than common knowledge and experience is necessary to form a correct judgment on the question of brain death. See generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence §702 (5th ed. 1990).

Our conclusion here that expert testimony is required to establish a diagnosis of brain death is further supported by *Janus* and *Haymer*. In *Haymer*, the court held that a determination of irreversible cessation of total brain function is to be made "according to usual and customary standards of medical practice." (*Haymer*, 115 Ill. App. 3d at 355.) As previously noted, expert testimony is necessary to establish such standards since they are beyond the ken of the average layman. (*Purtill v. Hess*, 111 Ill. 2d 229, 489 N.E.2d 867; *Walski v. Tiesinga*, 72 Ill. 2d 249, 381 N.E.2d 279.) In *Janus*, the court said that "where the death process is monitored by medical professionals, their testimony as to the 'usual and customary standards of medical practice' will be highly relevant when considering what constitutes a positive sign of life and what constitutes a criteria for determining death." (*Janus*, 135 Ill. App. 3d at 942, citing *Haymer*, 115 Ill. App. 3d 349, 450 N.E.2d 940.) The fact that a determination of brain death is to be made according to the standards of medical practice, and that testimony from medical professionals regarding those standards is highly relevant in that determination, further

supports our conclusion that expert testimony is required in a case such as this.

It is true that lay testimony may meet a party's burden of proving survivorship by showing "evidence of a positive sign of life in one body and the absence of any such sign in the other." (*Janus*, 135 Ill. App. 3d at 942, citing *In re Estate of Lowrance* (1978), 66 Ill. App. 3d 159, 383 N.E.2d 703.) Where such lay testimony is presented, it would logically follow that a jury could determine when death occurred without the assistance of expert testimony. However, there is no evidence in this case which would indicate that there were no positive signs of life in Sewart prior to the death of Mr. Popham on May 4. Had there been no positive signs of life in Sewart prior to May 4, we would not be concerned with the question of brain death, since the alternative standard of establishing death, the cessation of circulatory and respiratory function, would be satisfied. Sewart still had circulatory and respiratory function. Although these functions were artificially maintained, there is no evidence that he lacked these functions. Moreover, Dr. Caron stated that on May 4, nursing notes indicate that arm and leg movements were observed. On May 5, the entry was "neuro status unchanged," which Dr. Caron interpreted to mean further arm movement. Also on the 5th, body movement was noted, as well as jerky movement of the leg when stimulated. Accordingly, there was no lay testimony here which would enable a trier of fact to determine that Sewart had died prior to Mr. Popham, without the benefit of an expert opinion to that effect.

Plaintiff has had the opportunity to obtain an expert to support her position, and was apparently unable to do so, and relies on the position that an expert is not required. As discussed above, we disagree, and find that the facts relied on by plaintiff are insufficient to create a reasonable inference that Sewart predeceased Edward Popham without an expert opinion to that effect. Accordingly, since the movants for summary judgment have presented evidence that Sewart died on May 6, 1985, by presenting the death certificate, and plaintiff has offered no competent evidence to raise a reasonable inference to the contrary, we affirm the grant of summary judgment in favor of defendants as to count II.

Affirmed in part; reversed in part and remanded.

MURRAY and McNULTY, JJ., concur.