**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250414-U

Order filed May 18, 2026

---

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| ROBERT F. BABCZAK, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Plaintiff-Appellant, | ) | La Salle County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-25-0414 |
| | ) | Circuit No. 22-LA-80 |
| | ) | |
| ABBVIE CORPORATION, INC., | ) | |
| an Illinois Corporation, | ) | Honorable |
| | ) | Troy D. Holland |
| Defendant-Appellee. | ) | Judge, Presiding. |

---

JUSTICE BRENNAN delivered the judgment of the court.
Justices Holdridge and Davenport concurred in the judgment.

---

**ORDER**

¶ 1     *Held*:  The trial court properly granted defendant's motion for summary judgment and denied plaintiff's cross-motion for partial summary judgment in this strict product liability case.  Affirmed.

¶ 2     Plaintiff, Robert F. Babczak, filed a complaint alleging strict product liability against defendant, AbbVie Corporation, Inc., in relation to an intraocular medical device called a XEN gel stent used to treat glaucoma.  AbbVie represents in various pleadings, and in its appearance before this court, that its name is simply "AbbVie, Inc."  Following several continuances, Babczak failed

to disclose either an independent or a controlled expert witness pursuant to Illinois Supreme Court Rules 213(f)(2), (3) (eff. Jan. 1, 2018) to support his position that a defect in the XEN gel stent, specifically chemical residue, caused his alleged post-surgery injuries of excessive tearing, irritation, and a blind spot. AbbVie, in contrast, had procured the deposition testimony of Babczak's treating physicians, who opined that Babczak's injuries were not caused by a chemical residue on the XEN gel stent. AbbVie moved for summary judgment, arguing that, without an expert, Babczak could not prove the element of causation. Babczak filed a cross-motion for partial summary judgment on the question of liability only, arguing that causation had been established because the XEN gel stent had been subject to a recall and he suffered injuries after the stent had been placed in his eye. The trial court granted summary judgment to AbbVie, agreeing that, without an expert, Babczak could not prove the element of causation. Moreover, the trial court determined that Babczak had not submitted any admissible evidence to contradict AbbVie's evidence concerning causation. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                    A. Complaint

¶ 5        On May 24, 2022, Babczak filed the operative complaint against AbbVie, alleging strict product liability. Specifically, Babczak alleged that, in January and February 2019, he underwent a series of surgeries intended to halt the progression of glaucoma in both eyes. In the final surgery, he was injured by AbbVie's XEN gel stent that had been placed in his left eye. Months later, Babczak's surgeon, Dr. Evan Lagouros, informed him by letter that AbbVie had voluntarily recalled the relevant XEN gel stent. Dr. Lagouros's letter, which was attached to the complaint, stated that a small amount of polishing substance had been found on the sleeves covering the stent's injector needles. AbbVie did not recommend removing the stent—although conceivable that the

2

polishing agent could get into the eye and irritate it, no patient has complained of this. Babczak disagreed and alleged that AbbVie:

> "a. Failed to monitor the manufacturing process by controlling entry of foreign particles in the eye stent products sent to retail users; b. Failed to warn of the possible harmful effects that a defective product could cause to end users; c. Failed to specify and implement proper corrective actions to remedy the harmful effects of the defective product to end users such as the plaintiff herein. ***[A]s a direct and proximate result of one or more of the aforesaid acts of the defendant, the plaintiff has suffered the loss, partial or complete, of the use of his Left eye."

Babczak further alleged that he has "continuous excess aqueous humor in the [left] eye that has to be removed by wiping *** every 20 minutes during waking hours."

¶ 6                                                    B. Discovery

¶ 7                                         1. November 2, 2023, Protective Order

¶ 8         On September 20, 2023, AbbVie moved for a protective order regarding confidential, proprietary, and personal health information. Babczak, through an e-mail by counsel, expressed concern that the protective order would constitute a discovery waiver. AbbVie responded through an e-mail that the protective order was designed to facilitate the exchange of confidential information.

¶ 9         On November 2, 2023, the trial court entered a written order providing:

> "The Motion of the Defendant AbbVie Corp. for issuance of a Protective Order to include trade secrets and privileged information is granted: Proposed Order, pp. 1-16 inclusive, previously submitted to the Court and Counsel is to be entered this date."

¶ 10        The protective order itself provided:

"Discovery in this action is likely to involve production of confidential, proprietary, or private information for which special *protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted.* *** Accordingly, *to expedite the flow of information* to facilitate the prompt resolution of disputes over confidentiality of discovery materials, to adequately protect information the parties are entitled to keep confidential, to ensure that the parties are permitted reasonable necessary uses of such material in preparation for and in the conduct of trial, to address their handling at the end of the litigation, and serve the ends of justice, a protective order for such information is justified in this matter." (Emphases added.)

We quote the above language, which does not itself include confidential information, as is necessary to address Babczak's argument on appeal.

¶ 11                                  2. Rule 213(c): Babczak's Interrogatories

¶ 12         On June 19, 2023, Babczak served his first set of interrogatories, numbered as 24 interrogatories with 135 subparts. On July 11, 2023, AbbVie moved in opposition to the interrogatories, arguing that they violated Illinois Supreme Court Rule 213(c) (eff. Jan. 1, 2018) ("Except as provided in subparagraph (j), a party shall not serve more than 30 interrogatories, *including sub-parts*, on any other party except upon agreement of the parties or leave of court granted upon a showing of good cause. *A motion for leave* of court to serve more than 30 interrogatories must be in writing and shall set forth the proposed interrogatories and the reasons establishing good cause for their use." (Emphases added.)) On July 26, 2023, the trial court conducted a status hearing addressing both AbbVie's motion in opposition and a motion to compel filed by Babczak. There, Babczak invited the court to determine that his interrogatories were permitted by Rule 213(j), *id*. § (j) ("[t]he Supreme Court, by administrative order, may approve

4

standard forms of interrogatories for different classes of cases"), or to construe his motion to compel as a request for leave to serve more than 30 questions permitted by Rule 213(c), *id.* § (c). The trial court rejected Babczak's approach and, on July 27, 2023, it quashed Babczak's first set of interrogatories and granted him leave to serve a revised set that "comport[s] with Rule 213's 30 interrogatory limit."

¶ 13 On August 7, 2023, Babczak served his second set of interrogatories, eliminating 55 subparts and leaving 80. At a November 15, 2023, status hearing, the trial court noted that Babczak had never filed a written motion for leave to serve more than 30 interrogatories. With subparts, Babczak had served more than 30 interrogatories. The court further noted that, even if it construed Babczak's various motions and oral responses as a request for leave, Babczak had not shown good cause for the use of more than 30 interrogatories. On November 17, 2023, the trial court again quashed Babczak's interrogatories and again granted leave to serve interrogatories that complied with Rule 213's 30-question limit.

¶ 14 On February 13, 2024, AbbVie answered a revised set of interrogatories. On February 22, 2024, the trial court entered an order following a status hearing, noting that the parties would schedule a 201(k) conference pursuant to Illinois Supreme Court Rule 201(k) (eff. March 13, 2023) in a reasonable attempt to resolve differences to the extent that any written discovery issues remained. In addition, the parties would begin scheduling depositions. The record does not indicate whether the parties conducted a Rule 201(k) conference, and the parties proceeded to depositions.

¶ 15 3. Deposition: Dr. Evan Lagouros

¶ 16 Dr. Lagouros testified that he performed the surgery on Babczak's left eye and implanted the XEN gel stent. The XEN gel stent operates to create a new reservoir for eye fluid to drain and

5

thereby relieves eye pressure and halts the progression of glaucoma. The reservoir is often referred to as a "bleb."

¶ 17 Dr. Lagouros has published a study on the XEN gel stent and has served as a board speaker for AbbVie and the XEN gel stent. He has performed 100 to 150 XEN gel stent implantations per year, including during the years when the now-recalled products were in the market stream. Dr. Lagouros understood the recall to notify providers that a polishing substance had been found on the sleeves of a sampling of packages. Since sending the November 2019 letter to his patients concerning the AbbVie recall, Dr. Lagouros's office has changed its policy to send notice of only of those recalls affecting patients' health. Dr. Lagouros did not believe the AbbVie recall affected patient health.

¶ 18 Dr. Lagouros physically examines each XEN gel stent before surgery. He has never observed particulate matter on a stent. None of his patients have ever experienced the sort of reaction that a medical professional would expect from a polishing substance. There are, however, other risks associated with the XEN gel stent. Dr. Lagouros warns his patients of infection of the bleb (1% risk per year); rejection of the foreign object (no risk percentage given); or a simple failure to slow the development of glaucoma (30% risk). Dr. Lagouros also warns patients generally of risks set forth in the XEN brochure including: the build-up of fluid, a wound leak, blood in the eye, very low eye pressure, a moving implant, implant exposure, and surgical intervention.

¶ 19 Babczak came out of surgery in "good condition." If a polishing substance had gotten into Babczak's eye, Dr. Lagouros would have expected to see a reaction within one week of implantation, which he did not. Dr. Lagouros last saw Babczak on May 23, 2019, as part of a standard post-operative visit. He noticed no unusual inflammation, particulate matter, or severe

6

watering. Given that Dr. Lagouros last saw Babczak nearly five years prior to his deposition, he was not in a position to testify to Babczak's current condition.

¶ 20                                    4. Deposition: Dr. Robert D. Pode

¶ 21        Dr. Robert Pode testified in deposition that he is Babczak's treating ophthalmologist. He opined that the XEN gel stent is working as it should to reduce pressure in Babczak's left eye and reduce the loss of vision due to glaucoma. Babczak does have a blind spot in his left eye, but this is due to the progression of glaucoma over the years. Dr. Pode did not believe the XEN gel stent should be removed from Babczak's eye; he had no criticisms of the XEN gel stent.

¶ 22        Dr. Pode recalled Babczak complaining of watery eyes. To a reasonable degree of medical certainty, the watery eyes were caused by: (1) a blockage; or (2) the intended protrusion of the bleb creating dry eyes or a "foreign body sensation," either of which could trigger teary eyes. Dr. Pode offered but ultimately did not perform an irrigation procedure, because Babczak did not pursue the procedure. Babczak's attorney generated a list of 16 symptoms experienced by Babczak, and Pode testified that, to a reasonable degree of medical certainty, the XEN gel stent did not cause the symptoms.

¶ 23                          5. Rule 213(f)(2), (3): Babczak's Expert Disclosures

¶ 24        The trial court set a deadline of November 4, 2024, for Babczak to disclose his expert witnesses under Illinois Supreme Court Rules 213(f)(2), (3) (eff. Jan. 1, 2018). Rule 213(f)(2) addresses the requirements for an "independent expert witness," meaning a "person giving expert testimony who is not the party, the party's current employee, or the party's retained expert." *Id*. § (f)(2). "For each independent expert witness, the party must identify the subjects on which the witness will testify and the opinions the party expects to elicit." *Id*. Rule 213(f)(3) addresses the requirements for a "controlled expert witness," meaning "a person giving expert testimony who is

7

the party, the party's current employee, or the party's retained expert." *Id*. § (f)(3). "For each controlled expert witness, the party must identify: (i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." *Id*.

¶ 25　　　On November 8, 2024, Babczak moved for an extension to disclose his expert witnesses. He explained at the hearing that he had reached out to a doctor named Ema Avdogic: "Now, Dr. Avdogic, whom I do not know, I've never spoken to her, has diagnosed a large bleb. *** Again, I don't know what she's going to say." Over AbbVie's objection, the trial court extended the deadline to January 15, 2025.

¶ 26　　　On January 15, 2025, Babczak disclosed a different doctor, Dr. Meenakshi Chaku of Loyola Medical Center, as a Rule 213(f)(3) controlled expert witness. Babzcak further disclosed that two doctors, the aforementioned Dr. Avdogic as well as a doctor named Risshi Patel, both of Chicago Arbor Eye Care Center, would testify "not as [Rule] 213(f)(3) witnesses, but as *** neutral non-treating physicians."

¶ 27　　　On January 23, 2025, AbbVie moved to strike the disclosures, arguing that the disclosure of Dr. Chaku did not comply with Rule 213(f)(3)'s requirements. AbbVie also argued that, even if Babczak's reference to "neutral non-treating physicians" could be construed as an attempt to disclose Drs. Avdogic and Patel as Rule 213(f)*(2)* witnesses, the attempted disclosure did not comply with Rule 213(f)(2)'s requirements.

¶ 28　　　On March 3, 2025, the trial court granted AbbVie's motion to strike as to Drs. Avdogic and Patel: "[T]hese *** doctors that are called neutral non-treating physicians. Okay. I don't know what that is. I don't think it's in the statute. I don't think they're (f)(2)'s. They're not

8

controlled (f)(3)'s. So those are going to be stricken." However, the court granted an extension as to Dr. Chaku:

> "Here's what I am going to do, and this is only in the interest of trying to make sure this case is heard on the merits, which I've done previously, and this is going to be the last chance the court allows for this. *** So I'm going to give [Babczak] a brief opportunity to submit a proper 213(f)(3) disclosure *** after he meets with Dr. Chaku. *** And I guess I'm giving you a warning, [counsel for Babczak,] that if that [Rule 213(f)(3)] information is not there in that disclosure, I am going to strike that next one and there's not going to be a chance to amend."

Babczak agreed that, if Dr. Chaku did not support his theory of the case, he would have to dismiss it: "But if I find out tomorrow that she will not support our case, then I would move to dismiss it because I would have to."

¶ 29    On March 12, 2025, Babczak filed a "Report to the Court, Production: Report of [Dr. Chaku], Witness Pursuant to S.C.R. 213(f)(3)." Dr. Chaku reported that she conducted an independent medical examination of Babczak. She found that Babczak's vision loss was due to the underlying glaucoma condition, stating Babczak had "structural damage to the optic nerve and resulting peripheral vision loss *from his glaucoma*." (Emphasis added.) She found that Babczak's tearing and irritation were likely caused by the bleb reservoir:

> "Mr. Babczak presented with symptomatic tearing and irritation likely related to the large bleb in his left eye. *** A bleb is created by *** the XEN gel stent [which causes] fluid from the inside of the eye (which creates pressure) [to be] shunted to the surrounding tissue. This lowers the pressure in the eye, reducing the risk of *** glaucoma damage ***[.]

9

When the bleb is large, symptoms such as tearing and irritation can occur. ***.

*** However, given the advanced nature of his glaucoma, surgical removal of the stent would likely result in high eye pressure. This could put him at high risk for further glaucoma damage and vision loss, with a risk of complete blindness."

¶ 30 Dr. Chaku could not determine whether a defect in the XEN gel stent could have contributed to Babczak's symptoms: "The XEN [gel] stent recall was issued due to trace amounts of polishing compounds that were used in the manufacturing process. *It is unknown what particular compounds were found and their contribution to his symptoms*." (Emphasis added.)

¶ 31 On March 17, 2025, AbbVie again moved to strike Babczak's disclosure. On April 21, 2025, the trial court granted the motion to strike Babczak's disclosure, including Dr. Chaku's March 12, 2025, report, for failure to comply with Rule 213(f)(3): "As Plaintiff has already been afforded multiple opportunities to produce an expert disclosure and report that comports with the requirements of Supreme Court Rule 213(f)(3), further leave for Plaintiff to submit an Expert Disclosure is DENIED." The court had explained at the hearing:

"There's no opinion [from Dr. Chaku that] the plaintiff's XEN stent was defective. There's no opinion that [it] had polishing compound on it. There's no opinion that the polishing compound was a cause of the plaintiff's injury. None of that's present.

*** And this is reading from her report [:] [']It's unknown what particular compounds are found and their contribution to his symptoms.['] So there's no causation opinion from her."

Following the court's explanation, AbbVie informed the court that it planned to move for summary judgment "based on the lack of causation opinion."

¶ 32 C. Cross-Motions for Summary Judgment and the Trial Court's Order

10

¶ 33    On May 20, 2025, AbbVie moved for summary judgment. It argued that Babczak presented no evidence to establish a genuine issue of material fact that AbbVie's XEN gel stent suffered a defect, that AbbVie failed to warn that its product was unreasonably dangerous and/or failed to properly instruct on its usage, or that AbbVie's product caused Babzcak's alleged injuries of excess tearing, irritation/burning, and a blind spot in the left eye.

¶ 34    On May 23, 2025, Babczak filed a cross-motion for partial summary judgment as to liability only. Babczak argued that, as a matter of law, the recall of the XEN gel stent showed that the XEN gel stent that Babczak received was defective and that the defect caused his eye injuries. Babczak also put forth a new reason the product may have been defective in that a dangerous chemical, glutaraldehyde, had been used in the manufacturing process. Babczak pointed to an exhibit used in Dr. Pode's deposition, which was a seven-page, single spaced document published by AbbVie's predecessor regarding the use of the XEN gel stent and a description of the device. The description set forth that the XEN gel stent was "composed of a gelatin derived from porcine dermis, formed into a tube, and then cross-linked with *glutaraldehyde*." (Emphasis added.) From there, Babczak's attorney did his own Internet research and concluded that glutaraldehyde is a dangerous substance that can damage the eyes. This research included a document from the New Jersey Department of Public Health, which provided that glutaraldehyde is a "hazardous substance" that is used in the cold sterilization of medical equipment but that, if it were to enter the eye, the eye would need to be flushed with water for 15 minutes.

¶ 35    On July 30, 2025, the trial court entered a written order, granting AbbVie's motion for summary judgment and denying Babczak's cross-motion for partial summary judgment. It explained:

11

"[E]ven if the Court were to find that [AbbVie's] recall of the XEN gel stent is sufficient circumstantial evidence to raise [an] issue of a material fact as to a defective product or a failure to warn[,] which this court does not find, [Babczak's] failure to come forward with sufficient evidence that establishes that the XEN gel stent is the *cause* of [his] alleged injuries is what is lacking, as a matter of law." (Emphasis added.)

¶ 36    The trial court further noted that, even after receiving multiple extensions, Babczak did not meet the requirements set forth in Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018) concerning the disclosure of a controlled expert witness who would opine that the alleged defect (contamination from a polishing compound) caused Babczak's injuries. Babczak's attempt to disclose Dr. Chaku was deficient because it did not set forth her qualifications, the subject matter to which she would testify, or her conclusions or opinions. Instead, her report stated: "The XEN stent recall was issued due to trace amounts of polishing compounds that were used in the manufacturing process. *It is unknown what particular compounds were found and their contribution to [Babczak's] symptoms*." (Emphasis added.) Dr. Chaku's report did not contradict the opinions of Babzcak's own treating physicians so as to establish a material question of fact as to causation.

¶ 37    The trial court rejected Babczak's "new theory" that glutaraldehyde, as opposed to a polishing compound, caused his injury. It explained that the theory was based on inadmissible evidence from Wikipedia pages and other Internet sources lacking in foundation and/or constituting hearsay.

¶ 38    Finally, the trial court found that Babczak's other arguments related to discovery were untimely and lacked merit. For example, appearing to implicate the November 2, 2023, protective order or the 30-question limit for interrogatories, Babczak complained that AbbVie never

12

identified the chemical components of the polishing compound. However, Babczak's attorney "never requested the components and he did not bring a motion to compel [AbbVie] to provide the components if they were requested." Also, the court disagreed that its "fairly standard," November 2, 2023, protective order prohibiting the disclosure of confidential information to anyone not involved in the litigation constituted an improper ban on evidence concerning trade secrets.

¶ 39    This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41    Summary judgment is proper if, viewed in a light most favorable to the nonmoving party, "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005 (c) (West 2024); *Northern Illinois Emergency Physicians, et al. v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 305 (2005). "Summary judgment is a drastic means of disposing of litigation." *Northern Illinois*, 216 Ill. 2d at 305. The purpose of summary judgment is not to try a material question of fact, but to determine whether one exists. *Id*. A defendant seeking summary judgment may meet its initial burden of production by presenting evidence which, if uncontradicted, would entitle it to judgment as a matter of law. *Estate of Sewart*, 236 Ill. App. 3d 1, 8 (1991). This may be accomplished with evidence that some element of the plaintiff's case must be resolved in the defendant's favor or by showing that there is an absence of evidence to support an element of the plaintiff's case. *Atanus v. American Airlines, Inc.*, 403 Ill. App. 3d 549, 554 (2010). Once the defendant produces such evidence, the burden of production shifts to the plaintiff. *Sewart*, 236 Ill. App. 3d at 8. Although a plaintiff bearing the burden of production need not prove its case to withstand summary judgment, it must produce some *admissible* evidence, "beyond speculation, conjecture, or guess," that would enable a trier of

fact to resolve the case in its favor. *Tafoya-Cruz v. Temperance Beer Company*, 2020 IL App (1st) 190606, ¶ 68; see also *Complete Conference Coordinators, Inc. v. Kumon North America, Inc.*, 394 Ill. App. 3d 105, 108 (2009) ("Evidence that would be inadmissible at trial is not admissible in support of or in opposition to a motion for summary judgment"). For this reason, summary judgment is often referred to as the "put up or shut up" moment in a lawsuit. *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 68. If a plaintiff bearing the burden of production fails to "put up" evidence that would allow a trier of fact to resolve the case in its favor, summary judgment is properly granted to the defendant. *Sewart*, 236 Ill. App. 3d at 8. Summary judgment rulings are subject to *de novo* review. *Tafoya-Cruz*, 2020 IL App (1st) 190606, ¶ 55.

¶ 42        To prevail in a strict product liability action, the plaintiff must prove that: (1) a condition of the product was unreasonably dangerous; (2) the unreasonably dangerous condition existed at the time the product left the manufacturer's control; and (3) the unreasonably dangerous condition caused the complained-of injury. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 525 (2008). A plaintiff may establish that a condition of the product was unreasonably dangerous by showing: (1) a manufacturing defect; (2) a design defect; or (3) a failure to warn. *Salerno v. Innovative Surveillance Technology, Inc.*, 402 Ill. App. 3d 490, 497 (2010). When a plaintiff proceeds under a manufacturing defect theory, unreasonable danger is evaluated under the consumer-expectation test. *Id*. at 498. The consumer-expectation test asks whether the product is more dangerous than would be expected by the ordinary consumer with ordinary knowledge common to the community of the product's characteristics. *Id*. When a plaintiff proceeds under a design defect theory, unreasonable danger is evaluated under both the consumer-expectation test and the risk-utility test. *Id*. The risk-utility test asks whether, on balance, the benefits of the design outweigh the risks associated with the design. *Id*. Finally, when a plaintiff proceeds under a failure to warn theory,

14

unreasonable danger is evaluated by considering whether the manufacturer failed to disclose an unreasonably dangerous condition or instruct on the proper use of the product. *Id*. at 499.

¶ 43    In this case, it is unclear upon which theory of unreasonable danger Babczak proceeds—manufacturing defect, design defect, or failure to warn. His complaint alleges a manufacturing defect and a failure to warn or correct for the harmful effects of said defective product. His initial allegations implicated a manufacturing defect theory, in that AbbVie recalled the product due to the presence of a polishing agent on some products within the batch. His subsequent allegations concerning the use of glutaraldehyde primarily implicated a design defect theory, in that Babczak appeared to argue that glutaraldehyde is *per se* dangerous even if used in compliance with manufacturing guidelines. Babczak does not adequately develop a failure to warn theory—it is unclear whether he contends AbbVie failed to warn his treating physician or him about risks associated with any use of a polishing compound or glutaraldehyde or whether AbbVie failed to adequately advise for the removal of the XEN gel stent after the recall. At the hearing on the motion for summary judgment, Babczak presented his failure to warn theory as dependent on his defect theory: "How in the world could [Dr. Lagouros] give warnings about a defective product when he had no knowledge of it [prior to the recall letter]?"

¶ 44    Even if we were to assume for the purposes of argument that Babczak produced enough circumstantial evidence from which a trier of fact could find a manufacturing defect, a design defect, or a failure to warn, Babczak failed to produce any admissible evidence from which a trier of fact could reasonably find that a defect *caused* his alleged injuries of excessive tearing, irritation, and a blind spot. As to causation, we first determine that AbbVie met its initial burden of production by presenting evidence which, if uncontradicted, showed that the element of causation must be resolved in its favor. See *Atanus*, 403 Ill. App. 3d at 554. Specifically, AbbVie presented

15

the deposition testimony of Babczak's treating physicians Drs. Lagouros and Pode which, if uncontradicted, showed that no chemical on the XEN gel stent caused Babczak's alleged injuries. To review, Dr. Lagouros testified that he performs over 100 XEN gel stent implantations per year. He opined that the XEN gel stent recall did not concern patient health. He has never had a patient, including Babczak, react as he would expect if the patient had gotten a polishing substance in the eye. Babczak came out of the surgery in good condition. At the post-operative visit, Dr. Lagouros did not observe unusual inflammation, particulate matter, or severe watering. In addition, Dr. Pode testified that, while he recalled Babczak complaining of watery eyes, he never followed up to receive an irrigation procedure. Dr. Pode opined that the watery eyes were due to a blockage or a foreign-body sensation due to the intentionally-created bleb reservoir, not a reaction to a chemical. In addition, Babczak's blind spot was due to the underlying glaucoma, not a reaction to a chemical. The testimony of Drs. Lagouros and Pode shifted the burden of production to Babczak.

¶ 45        We next determine that Babczak failed to produce any admissible evidence, beyond speculation, that a defect in the XEN gel stent caused his injuries. The plaintiff's theory of causation must have a reasonable evidentiary basis and a trier of fact may not engage in speculation. *Philips v. United States Waco Corp.*, 163 Ill. App. 3d 410, 417 (1987). The mere fact that an injury occurred is not a sufficient evidentiary basis from which a trier of fact may infer that a product was defective. *Id*. When expert testimony is necessary to support the plaintiff's theory of causation, and the plaintiff fails to disclose such an expert, summary judgment for the defendant is proper. See *Baltus v. Weaver Division of Kidde & Company, Inc.*, 199 Ill. App. 3d 821, 827 (1990) (concerning the condition of the product). Expert testimony is necessary when "more than common knowledge and experience are necessary to understand the issues and to form an opinion." *Sewart*, 236 Ill. App. 3d at 15 (expert testimony necessary to establish time of brain

16

death); *Eberle v. Brenner*, 131 Ill. App. 3d 394, 398 (1985) (expert testimony necessary to establish whether medical malpractice led to the amputation of a finger).

¶ 46    In this case, expert testimony is necessary to understand Babczak's various theories of causation. Babczak admitted as much when he agreed, at the March 3, 2025, hearing that he would have to dismiss his case if he could not find an expert to support his position. Babczak argues that the polishing agent that was the subject of the recall, or glutaraldehyde used in the standard manufacturing of the product, or some combination of the two, caused his alleged injuries. However, Dr. Lagouros testified that, if a chemical had injured Babczak's eye, he would have expected to see such an injury within a week of implantation. He did not. Babczak needed to disclose an expert to explain how a polishing agent, yet unnamed, could have caused an extended state of irritation in his eye over the course of years. Similarly, an expert was necessary to explain how the use of glutaraldehyde in the manufacturing process, as opposed to glutaraldehyde in general, could damage the eye. Any number of otherwise dangerous chemicals may be carefully used in manufacturing processes, and, without an expert, Babczak asks this court to engage in speculation that the XEN gel stent implanted into his left eye contained chemical residue that caused his injuries.

¶ 47    Because AbbVie has shown that Babczak cannot prove the causation element of his case, the court properly granted summary judgment to AbbVie. Necessarily, the court properly denied Babczak's motion for partial summary judgment.

¶ 48    Babczak attempts to avoid this result by arguing that the trial court committed "plain error" in its limitation of discovery. The plain-error doctrine "finds much greater application" in criminal cases. *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 55. Appellate courts have applied the plain-error doctrine in civil cases in "exceedingly rare" instances where

17

the complained-of ruling "was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process." (Internal quotation marks omitted.) *Id*. By invoking the plain-error doctrine, Babczak appears to concede that he did not preserve his various challenges to the trial court's discovery rulings.

¶ 49  The limitations of which Babczak complains concern: the November 2, 2023, protective order; Rule 213(c)'s cap of 30 interrogatories; and Babczak's Rule 213(f)(3) disclosure of Dr. Chaku. Babczak contends that, had the trial court been more liberal in its discovery rulings, he would have obtained the evidence he needed to create a material question of fact as to causation. Discovery rulings generally are within the trial court's discretion, *Reda v. Advocate Health Care*, 199 Ill. 2d 47, 54 (2002), and, here, we discern no error in the court's exercise of its discretion, let alone plain error. Therefore, even if we were to construe Babczak's repeated use of the term "plain error" in a more colloquial sense meaning an error of great magnitude as his brief alternatively urges, our result would be the same.

¶ 50  The November 2, 2023, protective order did not hinder Babczak's discovery. Rather, the protective order merely provided that, information deemed confidential by the parties, such as AbbVie's "trade secrets" as well as information about Babczak's health, would be afforded "special protection from public disclosure and from use for any purpose other than prosecuting [the instant] litigation." As noted by AbbVie, the purpose of the protective order was to "expedite the flow of information," not to hinder it. As noted by the trial court, this was a "fairly standard" protective order that in no way prohibited Babczak from obtaining the information he sought and, instead, merely prohibited either party from disclosing confidential information to third parties for purposes unrelated to the lawsuit.

¶ 51    Nor did the trial court abuse its discretion in limiting Babczak to serving 30 interrogatories pursuant to Rule 213(c).  Rule 213(c) provides:

> "Except as provided in subparagraph (j), a party shall not serve more than 30 interrogatories, including sub-parts, on any other party except upon agreement of the parties or leave of court granted upon a showing of good cause.  A motion for leave of court to serve more than 30 interrogatories must be in writing and shall set forth the proposed interrogatories and the reasons establishing good cause for their use."  Ill. S. Ct. R. 213(c) (eff. Jan. 1, 2018).

¶ 52    Rule 213(j) provides that the "Supreme Court, by administrative order, may approve standard forms of interrogatories for different classes of cases."  Ill. S. Ct. R. 213(j) (eff. Jan. 1, 2018).  The supreme court has approved standard forms that include subparts for motor vehicle, matrimonial, and medical malpractice cases.  See *id.* (Appendix, Amended Interrogatories Under Rule 213(j)).  Accordingly, Rule 213(j) does not exempt a party in a strict product liability case from adhering to Rule 213(c)'s requirement that a party seeking to exceed 30 interrogatories must obtain the other party's agreement or file a written motion with the court that sets forth the proposed interrogatories and the reasons for establishing good cause for their use.

¶ 53    Babczak did not follow Rule 213(c)'s requirements.  He never filed a written motion to exceed 30 interrogatories or set forth good-cause reasons for including the specific interrogatories at issue.  The trial court observed these facts and did not abuse its discretion by requiring Babczak to follow Rule 213(c). Moreover, following AbbVie's February 13, 2024, answer, the record does not show that Babczak ever sent a deficiency letter, requested a Rule 201(k) conference, or filed a motion to compel an answer to any specific interrogatory.  Even on appeal, Babczak fails to set

19

forth precisely which of his interrogatories AbbVie declined to answer and how that prejudiced his case.

¶ 54 Finally, the trial court did not abuse its discretion in striking Babczak's Rule 213(f)(3) disclosure of Dr. Chaku, nor in denying further leave to file an expert disclosure. Rule 213(f)(3) provides in part that, for each controlled expert witness, the party must identify "the conclusions and opinions of the witness and the bases therefor." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2018). Babczak's March 12, 2025, disclosure of Dr. Chaku did not provide her "conclusions and opinions" as pertains to the relationship, if any, between an alleged defect in the XEN gel stent and Babczak's injuries. As noted by the trial court, Dr. Chaku's report contained no opinion that the XEN gel stent was defective, that there was polishing compound on the stent, or that a polishing compound caused Babczak's injury. To the contrary, Dr. Chaku expressly declined to opine on the relationship between the XEN gel stent and Babczak's injuries: "It is *unknown* what particular compounds were found [as part of the recall] and their contribution to [Babczak's] symptoms." (Emphasis added.)

¶ 55 The trial court gave Babczak abundant opportunity to submit expert disclosures pursuant to either Rule 213(f)(2) or (f)(3). Babczak missed the November 4, 2024, disclosure deadline. Four days later, he asked for, and received, a two-month extension over AbbVie's objection. Babczak's January 15, 2025, disclosure of Drs. Avdogic and Patel referred to them not as Rule 213(f)(2) independent witnesses but as "neutral non-treating physicians" and, in any event, failed to identify their expected opinions. See Ill. S. Ct. R. 213(f)(2) (eff. Jan. 1, 2018) (requiring a party to identify the opinion that it expects to elicit from the expert). Babczak's January 15, 2025, Rule 213(f)(3) disclosure of Dr. Chaku also failed to identify any expected opinion testimony. The trial court nevertheless ruled that, "in the interest of [hearing] this case on the merits," it would give

Babczak a final opportunity to submit a proper expert disclosure. It warned, however, that if Babczak again failed to comply with the rules, it would strike the disclosure and there would not be another opportunity. On March 12, 2025, Babczak re-submitted a Rule 213(f)(3) disclosure of Dr. Chaku. However, as discussed, Babczak's final attempt again failed to meet Rule 213(f)(3)'s disclosure requirements. Accordingly, we determine that the trial court did not abuse its discretion in denying further leave to submit an expert disclosure.

¶ 56 In sum, the trial court properly granted summary judgment to AbbVie. AbbVie produced evidence that, if uncontradicted, established that its product did not cause Babczak's injuries. Rather, AbbVie submitted deposition testimony that explained that the blind spot was a result of the underlying glaucoma condition and the excessive tearing and irritation were more likely the result of a blockage or an intended pressure reduction system called a bleb that, despite its downsides, was nevertheless effective in preventing Babczak from going completely blind. AbbVie successfully shifted the burden of production to Babczak, who failed to disclose an expert to support his position that a chemical residue on the XEN gel stent caused his injuries. As Babczak's theory of causation was speculative, the trial court also properly denied his motion for partial summary judgment as to liability.

¶ 57 III. CONCLUSION

¶ 58 The judgment of the circuit court of La Salle County is affirmed.

¶ 59 Affirmed.